**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| LORRAINE STRICKLAND | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:06-CV-199 |
| | ) | |
| FIRST BANCSHARES, INC., d/b/a | ) | |
| CENTIER BANK, INC., its wholly | ) | |
| subsidiary, Indiana Corporations; | ) | |
| MICHAEL E. SCHRAGE, individually | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court are Defendants' Michael E. Schrage's ("Schrage's") and Centier Bank, Inc.'s ("Centier's"), Motions for Summary Judgment filed on June 18, 2007. Plaintiff, Lorraine Strickland ("Strickland") responded in opposition on July 23,2007 to which the defendants replied on August 10, 2007.[1] For the following reasons, Schrage's Motion for Summary Judgment will be GRANTED in its entirety. Centier's Motion for Summary Judgment will be GRANTED in part and DENIED in part.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim.

---

[1]This case was reassigned to the undersigned effective February 4, 2008. The motions for summary judgment were pending at the time of the reassignment.

1

*Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).   A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir. 1986).   No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992)(quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)).

Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *Id.*   A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.  Mindful of these principles the court turns now to the case at hand.

## **FACTUAL BACKGROUND**[2]

---

[2]The following facts are taken from the summary judgment record and are viewed in the light most favorable to Strickland, the nonmoving party.

Centier employed Strickland in its Marketing Department beginning in June, 1995. In April, 1999, Strickland became the head of the Marketing Department and began reporting directly to Defendant Schrage, the President and CEO of Centier. Strickland's husband, Wes, joined the Bank as a co-manager in 2001.

For the most part, Strickland received positive performance evaluations[3] throughout her time with Centier. For instance, in a review in June, 1996, her then-supervisor, Cyndi Garnett, indicated that Strickland needed to improve her flexibility and "count to 10" when she became frustrated. In that same review, Strickland received an overall rating of 3 out of a possible 5 in the category of leadership.

When Strickland was promoted in April 1999, Schrage began conducting Strickland's performance evaluations. In July 1999, Schrage indicated that Strickland needed to "keep cool under pressure and in difficult situations. Stay professional in your verbal and nonverbal." (Schrage Dep. at 28-29). Notes in Strickland's January, 2000 performance evaluation also reflect that she was rated below acceptable in "relationship building." (*Id.* at 25). In January 2001, Strickland received a notation on her evaluation relating to her interpersonal skills which read, "Stress does affect your performance and communication. Keep cool and process before blurting out." (*Id.* at 30*)*.

Similar types of commentary appeared on Strickland's annual evaluations in 2002 and 2003 (as well as her mid-year evaluations), although her overall performance ratings either exceeded employer expectations or were classified as "exceeds minus, " which Schrage explained meant that her performance was "on the low side" of exceeding the employer's expectations. In the 2002

---

[3]This court has scoured the record for the actual performance review documents for the plaintiff. They do not appear to have been submitted to the court but discussion of the documents occurred in various deposition excerpts which have been provided to the Court.

evaluation, Strickland received a below acceptable rating regarding staff development and was advised that "turnover and lack of loyalty and commitment has been difficult."  She was then given a goal to improve her "mentoring and rapport." (*Id.* at 32).  In her July, 2003 review, Schrage wrote a notation under personal development indicating that he had become aware of some concerns about having both Strickland and her husband as department heads.

None of the various concerns or areas for improvement noted in any of Strickland's performance reviews appeared serious enough to trigger any sort of disciplinary or probationary period nor did her overall rating on any of the reviews fall below "exceeds minus."

a.      **Allegations of Sexual Harassment by Strickland**

Throughout the course of her employment, Strickland alleges she was subjected to repeated instances of sexually harassing behavior from Schrage.  Strickland maintained a journal wherein she documented the instances of harassment that "stood out" in her mind.

The first instance, in the spring of 1996, Strickland alleges that Schrage touched her breast.  After she protested this behavior, Schrage falsely asserted in a meeting that she "screwed up" on a particular project.  Between that time and the fall of 1997, Strickland asserts numerous incidents when Schrage touched the lapel of Strickland's garment, which Strickland interpreted as attempts to touch her breasts.  She also experienced six or seven "pats" on her posterior from Schrage during this period.  Several other incidents are set forth below in bullet point format:

- On November 11, 1997, Schrage instructed Strickland to go to a tavern in Whiting, Indiana for an "officer luncheon."  When she arrived, she and Schrage were the only officers from Centier  at the tavern.  Schrage asked Strickland a number of personal questions during the encounter and, when Strickland was leaving, Schrage put his hand on her buttocks.

- On April 15, 1999, during a "going away" office party for Strickland's then-supervisor, Schrage told Strickland "now that you're reporting to me, you have some

serious ass-kissing to do." Schrage then put ice down Strickland's shirt and told her that it was to "cool off the twins." Strickland complained to Schrage immediately about this conduct and he denied that he was referring to her breasts but stated that he thought Strickland, who was pregnant at the time, was having twins.

- In May 1999, after Strickland became the head of the Marketing Department,[4] she attended a monthly committee meeting. When she entered, Schrage yelled at Strickland in front of the senior management, "Land HO...I have never seen anything as big in black and white since Shamu."

- Strickland was on maternity leave from July to September 1999. On October 5, 1999, she encountered Schrage in the lobby of Centier. He commented on Strickland's weight, indicating his surprise that she lost the pregnancy weight, and then squeezed her stomach.

- In January 2000, Schrage appeared to reach toward Strickland's breast. Strickland pulled away suddenly to avoid the contact. Immediately following this incident, Schrage screamed at Strickland in front of her staff and a design firm. Thereafter, Strickland arranged a meeting with Schrage to resign because of the incidents set forth above. Schrage apologized and indicated his behavior would change.

For approximately, a  year and a half following the above meeting between Schrage and Strickland, Strickland contends that Schrage's inappropriate patting of her posterior, excessive hugging at work and other places, and use of inappropriate language with respect to Strickland continued on "too many occasions" to recount in detail. Strickland sets forth the following additional incidents of harassment, all of which were recounted in her journal entries:

- On October 8, 2001, at a bank sponsored event, Strickland observed Schrage drinking beer, hugging, and kissing female associates of the bank. Schrage also grabbed Strickland, squeezed her tightly against him and tried to kiss her. Strickland pushed him away and advised him to go home.

- On December 21, 2002, Schrage approached Strickland at a bank sponsored Christmas party and insisted that she dance with him. While dancing, he suddenly unzipped Strickland's suit jacket.   As she attempted to zip her jacket back up,

---

[4]It was at this time that Schrage became Strickland's direct supervisor.  However, Strickland's office was located in a different Indiana city than Schrage's office.  Thus, the two did not have daily contact with each other although Strickland did see Schrage for meetings on a regular basis.

Schrage placed his hand on her breast and looked at her chest.

- On January 9, 2003, at Strickland's mother's wake Schrage greeted Strickland and said, "that's how you should look when you come to work. Look at your hair – you're wearing make-up. And you're wearing a skirt. I haven't seen those legs in forever."

- On December 5, 2003, Schrage instructed Strickland to arrange a "networking" Christmas celebration at her home. Several of the younger department heads and senior management were in attendance. Late in the evening, Schrage suddenly began to "hump" Strickland's leg in a sexual manner.

- Shortly after the incident described above, Schrage yells at Strickland at a Branding Team Meeting that "Lorraine can't project manage worth a shit."

- Schrage conducted Strickland's annual review in January 2004 at a local tavern in Schererville, Indiana.  Strickland believed that Schrage unfairly evaluated her, indicated that she "lacked professionalism" and needed to focus on losing weight and improving her appearance.

**b.**     **Strickland's Complaints to Human Resources**

Strickland contends (and Centier disputes it) that as early as November 1997, she began making oral complaints to the Human Resources Department and, in particular, to Vicky Bukowski ("Bukowski") and Christ regarding Schrage's behavior.  Strickland alleges she complained to Bukowski and/or Christ after incidents occurring in: November, 1997; May, 1999; January, 2000; October, 2001; December, 2002;  January, 2003; December, 2003; and January, 2004. There is no written record of these complaints in the record and, Christ, denies that any "complaints" were made to her other than mere "venting" or Strickland expressing her "frustration" with Schrage.  As far as Strickland is aware, no investigation of any of her complaints was launched.

**c.**     **Instances of Alleged Harassment to Other Female Centier Employees**

Aside from the instances alleged above, Strickland maintains that Schrage regularly sexually harassed other female employees at Centier as well.  For instance, Strickland recites that in October

2002, a temporary employee of Centier, Eileen Miller, reported to Centier staff that Schrage had inappropriately touched her breast.  Strickland, in turn, reported the incident to human resources personnel Chrisanne Christ ("Christ") as she was required to do. Thereafter, Strickland was advised by Schrage that Miller was not longer available to be called as a temporary employee for the Marketing Department.  Strickland was also told to advise another manager that Miller should also not be called as a temporary employee for the Retail Department of Centier.

Strickland also recites several incidents involving Schrage's behavior toward Debra Bouche, Angela Jimenez, and several other Centier employees.  However, Strickland did not personally observe Schrage's behavior and it appears, that Strickland learned of at least some of these incidents through rumor or gossip rather than through first-hand accounts.  (Pltf's Dep. at 193).

**d.** **Events Leading to Strickland's Termination**

In January[5] 2004, Schrage expressed to Strickland during her performance evaluation concerns he had with her management of the Marketing Department.  In particular, Schrage focused on Strickland's micro-management of the Department as well as the stress that it caused.  Schrage underlined specific areas in the interpersonal skills category of her review indicated that she needed to improve "maintain[ing] her demeanor in difficult situations" and "not letting stress disrupt actions."  Schrage also expressed concern that Strickland's health was suffering due to an inability to balance her home and work lives.  For this reason, Schrage suggested that Strickland work on a flexible schedule.  Strickland disagreed with Schrage's assessment that she was micromanaging.  Despite this commentary, Strickland's mid-year and annual reviews, however, demonstrated that

---

[5]There is some dispute in the record as to whether this is the correct month.  Defendants refer to the month as January while Strickland's brief notes that this occurred in July 2004.

she had, at least minimally, exceeded her employer's expectations.

Beginning in August 2004, rumors began circulating that Schrage and another female employee, Melissa Kirincic ("Kirincic"), were having an affair.[6]  Strickland was Kirincic's supervisor and contends that Kirincic would disappear from the office with Schrage for several hours; receive physical displays of affection from Schrage and otherwise receive favorable treatment from Schrage.  It is unclear from the record as to whether Strickland personally observed what she terms "inappropriate conduct" between the two or whether it was brought to her attention by other employees of Centier.  Either way, Strickland observed that employees within the department perceived the relationship in a manner that was causing problems within her department.[7]  As a result,  Strickland spoke with Schrage regarding his behavior with Kirincic and cautioned him that it was causing friction in the Marketing Department:

> I told him that the relationship was causing frictions within the department, and I asked him to, you know, be very careful.  If he was coming into the department, I asked him if he could acknowledge everyone in the department, say, 'Hello,' to the other people.  If he was coming to an event, you know, and you're going to hug one person, hug them all.  Just to be more cognizant.

(Strickland Dep. at p. 128). The exact date when Strickland had this conversation with Schrage is not developed in the record but, it appears to have occurred after August 2004 and prior to Strickland's performance review on January 17, 2005. Subsequently, Strickland alleges that Schrage began isolating her, refusing to speak to her, and treating her rudely in front of her peers.  In

---

[6]Schrage was married at the time.

[7]Strickland notes that other females in the department, having observed the personal relationship between Schrage and Kirincic, became frustrated with Kirincic and this culminated in one incident where a co-worker shouted at Kirincic.  Similarly, Strickland was having difficulty with Kirincic since she would bypass Strickland and take issues within the department directly to Schrage.

addition, Strickland contends that Schrage "reminded" Strickland's husband that she was an at-will employee and could be terminated immediately.

In January, 2005. Schrage became aware of additional issues within the Marketing Department that he believed would result in a more critical performance evaluation for Strickland than those he had written in the past. According to Schrage, Strickland was unwilling to complete projects and follow the chain of command. (Exh. B. Defendants' Response to Interrogatory #2). Strickland was also emotional which, in turn, elevated the stress level in the Marketing Department. Because of this, Schrage asked Centier's Senior Management Team to give him input on Strickland's job performance.  The Team provided an additional list of performance based issues which, in turn, caused Schrage more concern.[8]  Schrage then began to consider various options relating to Strickland's position, including asking Strickland to take a temporary leave of absence or to work on part-time projects only.

On January 15, 2005, Strickland and her husband held a birthday party for Schrage's wife in their home at the request of Schrage.  While in attendance, Schrage walked toward Strickland looking at her breasts and laughing. She thought that she may have spilled something on her shirt, and as she looked down, Schrage stated that "your headlights are on" and continued laughing. Strickland was embarrassed by this behavior and reported the incident to human resources upon her return to work.

Two days after this birthday party, on January 17, 2005, Strickland received her annual performance review from Schrage.  In that review Schrage underlined comments which reflected

---

[8]There is no submission in the record as to what the "additional list" of performance based issues were.

that Strickland needed improvement in the categories of "serv[ing] as a role model for associates" and "understand[ing], select[ing], develop[ing], coach[ing], and motivat[ing] others to create an environment based on our values, mission and essentials of excellence." (Schrage Dep. at 35). Under specific comments in the leadership category, however, Schrage wrote "dominance of your personality; stress and tension level in department; lack of mentoring staff effectively; department turnover, is it selection, understanding, developing or coaching;  too emotional." (Schrage Dep. at 36). Oddly, even with the above commentary her overall evaluation was positive and she was graded at an "exceeds plus" which Schrage indicated was the "high side of meeting expectations." (*Id.* at 37). Strickland believed Schrage wrote the comments critical of her performance in retaliation for her expressing concern regarding his relationship with Kirincic and for complaining to human resources about the incident at the birthday party.

Strickland was on medical leave from February 2005 until April 2005.[9]  While she was on leave, Wes Strickland became the temporary head of the Marketing Department.  On June 30, 2005, Schrage met with both Strickland and her husband to discuss options relating to Strickland's continued employment in the Marketing Department.  Schrage presented two options in lieu of termination; Strickland could take a sabbatical leave or temporarily work part-time. Under the latter option, Strickland would be reporting directly to her husband which, Strickland argues, is a violation of company policy.

A second meeting, held on July 7, 2005 occurred between Schrage and Wes Strickland wherein the mechanics of the temporary adjustment to Strickland's schedule were discussed.  In that

___

[9]Strickland contends that this medical leave was triggered by the stress of her work environment and, in particular, her treatment by Schrage.

meeting, Wes Strickland was advised that his wife must either accept one of these options, propose one of her own, or face termination.

Strickland did not accept either option or propose her own.  Centier then terminated[10] Strickland on July 25, 2005 claiming that she had voluntarily resigned from her position.  Prior to her termination, on July 14, 2005, Strickland    filed her Charge of Discrimination, which she subsequently amended on January 12, 2006, with the EEOC.  Thereafter, Strickland filed the present lawsuit against Centier and Schrage contending that she was subjected to hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964 as well as retaliation after she complained of the sexually harassing behavior.  Additionally, Strickland asserts state law tort claims of intentional infliction of emotional distress, retaliatory discharge, and invasion of privacy.

## **DISCUSSION**

As previously noted, Counts 1 and 2 of Strickland's Complaint allege that both Centier and Schrage are liable under Title VII for sexual harassment and retaliation.  Both Centier and Schrage have moved for summary judgment with Centier asserting that many of Strickland's complaints of sexually harassing behavior are time-barred, and the remaining complaints are insufficient to constitute a hostile work environment.  Centier also claims that Strickland cannot prevail on her retaliation claim because she did not engage in protected activity and, even if she had, she cannot show that the legitimate non-discriminatory reason for her termination is pretextual.  For his part, Schrage contends that he is entitled to summary judgment on the individual claims under Title VII because Title VII does not impose liability against an individual supervisor in his individual capacity

---

[10]There is a dispute about whether Centier "terminated" Strickland or whether Strickland "voluntarily resigned."  In any event, she was no longer employed at Centier as of July 25, 2005.

for alleged violations of Title VII. *See Williams v. Benny*, 7 F.3d 552 (7th Cir. 1995).

**A.**     **Title VII Claims Against Centier**

1.     Hostile Work Environment Sexual Harassment

Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  Indeed, in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 115-21 (2002), the Supreme Court held that a hostile working environment is a single unlawful practice under Title VII of the Civil Rights Act of 1964. A charge of discrimination based on such a practice covers all events during that hostile environment, if the charge is filed within 300 days (180 days in some states) of the last act said to constitute the discriminatory working condition. 42 U.S.C. § 2000e-5(e)(1).

According to the Defendants' analysis, Strickland has only alleged two incidents of sexually harassing conduct that occurred within 300 days of the date she filed her first EEOC charge, that is, 300 days prior to July 14, 2005. These two incidents are (1) Schrage's comment to Strickland that her "headlights" are on and (2) Strickland's "advice" to Schrage regarding his personal relationship with Kirincic.  Strickland, however, argues that conduct more than 300 days prior to her charge is actionable under a hostile work environment theory of liability since the Supreme Court has held that component acts of discrimination occurring outside the 300 day filing period are part of one unlawful employment practice.

**a.**     **Allegedly Discriminatory Acts Falling Outside the 300 Day Period**

As noted above, in *National Railroad*, the Supreme Court held that, as to hostile work

environment claims, an employer may be liable for discriminatory incidents occurring prior to the applicable 300-day limitations period. 536 U.S. at 115-21.  This is because a hostile work environment claim consists of many incidents that, although not necessarily individually actionable, may, as a whole, constitute a single unlawful employment practice. *Id.* at 115 (hostile work environments develop "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own"). Indeed, "if each harassing act had to be considered in isolation, there would be no claim even when by virtue of the cumulative effect of the acts it was plain that the plaintiff had suffered actionable harassment." *Limestone Development Corp. v. Village of Lemony, Ill.,* ___ F.3d ___, 2008 WL 852586 (7th Cir. 2008)*; see also Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1166 (7th Cir.1996) (citations omitted) ("Sexual harassment serious enough to constitute unlawful discrimination on grounds of sex is often a cumulative process rather than a one-time event. In its early stages it may not be diagnosable as sex discrimination, or may not cross the threshold that separates the nonactionable from the actionable, or may not cause sufficient distress to be worth making a federal case out of, or may not have gone on long enough to charge the employer with knowledge and a negligent failure to take effective remedial measures."). Under this analysis then, everything that happened during a campaign of harassment may be considered if any part of it extends into the period of limitations. *Id.* at 120.

Here, Centier contends that many of the incidents alleged by Strickland cannot be considered together as related acts of intentional discrimination because they are separated by a significant time lapse.  As the Seventh Circuit has explained it, "[t]he concept of *cumulation* suggests a critical limiting principle. Acts ... so discrete in time or circumstances that they do not reinforce each other

cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations." *Tinner v. United Ins. Co. of Am.,* 308 F.3d 697, 708 (7th Cir.2002) (quoting *Galloway v. Gen. Motors Serv. Parts Operations,* 78 F.3d 1164, 1166 (7th Cir.1996), and noting that *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) abrogated *Galloway* on other grounds). In *Tinner,* for example, the Seventh Circuit determined that an eight-year gap between discriminatory incidents could not constitute a single hostile work environment claim. *Tinner* in turn relied upon *Selan v. Kiley,* 969 F.2d 560, 566-67 (7th Cir.1992) which held that a two-year gap between alleged discriminatory acts could not support a hostile work environment claim since the time lapse was "considerable" and "weigh [ed] heavily against finding a continuing violation." *Selan,* 969 F.2d at 567; *Tinner,* 308 F.3d at 708-09.

Centier is correct that there is a considerable time lapse between several of the instances of harassing conduct relied upon by Strickland to establish her hostile work environment claim and the incidents alleged to have occurred within the limitations period.. And, while "a brief passage of time will not defeat automatically the application of the continuing violation doctrine, " *Lucas v. Chicago Transit Authority,* 367 F.3d 714, 727 (7th Cir.2004), the longer the time gap, the more likely it is that the incidents are unrelated to the unlawful employment practice alleged. *Id.* (concluding that chance meeting between former supervisor and plaintiff over three years after last discriminatory incident of "stretches the application of a continuing violation theory beyond any workable limit; it simply cannot be considered part of the same hostile environment practice."). Here, however, Strickland has not only alleged two acts of perceived discrimination within the limitations period but she has also set out numerous incidents spanning nearly ten years with, on the long side a year or two, and the short side several days or weeks, between instances of alleged

14

discriminatory conduct.  Having reviewed the record, the court concludes that this is not as troublesome as was found in other cases cited by Centier especially in light of the fact that Strickland was on medical leave and maternity leave several times during her employment which, of course, accounts for some of the time lapse.  Accordingly, the court concludes that the acts outside of the limitations period should be considered for purposes of Strickland's hostile work environment claim.

### b.  Elements of a Hostile Work Environment Claim

Even with all the acts alleged by Strickland included, however, Strickland must still demonstrate that: (1) "she was subject to unwelcome harassment"; (2) the harassment was based on her sex; (3) "the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment"; and (4) "there is a basis for employer liability." *Mason v. So. Illinois Univ. at Carbondale,* 233 F.3d 1036, 1043 (7th Cir.2000). Whether an employer's conduct creates a hostile work environment is not subject to "a mathematically precise test" and "can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22-23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Relevant circumstances include "the frequency and severity of the conduct; whether it was threatening and/or humiliating or merely an offensive utterance; and whether the harassment unreasonably interfered with her work." *McPherson v. City of Waukegan,* 379 F.3d 430, 438 (7th Cir.2004).

Moreover, while Title VII prohibits an abusive working environment, it does not mandate admirable behavior from employers. *Russell v. Bd. of Trs.,* 243 F.3d at 343; *see also Faragher v. City of Boca Raton,* 524 U.S. at 788 ("Title VII does not become a 'general civility code.' "). To rise to the level of actionable harassment, the alleged misconduct must alter the conditions of the

15

plaintiff's employment "in a significant way." *Perry v. Harris Chernin, Inc .,* 126 F.3d 1010, 1013

(7th Cir.1997) ("The workplace that is actionable is one that is 'hellish.' ") (citation

omitted)."Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do

not amount to actionable harassment. *Faragher v. City of Boca Raton,* 524 U.S. at 788; *Adusumilli*

*v.. City of Chicago,* 164 F.3d at 362 (holding that the Seventh Circuit has a "safe harbor for

employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal

to make a reasonable person believe that she has been discriminated against on the basis of her

sex.") (citing *Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1168 (7th

Cir.1996)).

In this case, Centier contends that Strickland cannot show that the harassment she

experienced was "severe or pervasive" enough to create an abusive environment and to alter the

conditions of her employment. *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. 2399, 91 L.Ed.2d 49.

In turn, Strickland argues that a reasonable trier of fact could find that she was harassed because of

her sex and that Schrage created a hostile work environment.   Strickland points to the fact that

Schrage made  sexually inappropriate comments, grabbed her, touched her inappropriately, leered

at her chest, and treated her boorishly in front of colleagues by referring to her using foul language.

Whether the harassment Strickland experienced meets is sufficient to avoid summary

judgment requires analysis of  both an objective and subjective component. *See Hilt-Dyson v. City*

*of Chicago,* 282 F.3d 456, 463 (7th Cir.2002). The subjective component asks whether the plaintiff

found the environment offensive or abusive while the objective component inquires as to whether

a reasonable person in the plaintiff's position would find the environment hostile.  *Faragher v. City*

*of Boca Raton,* 524 U.S. 775, 787-88 (1998).

16

The record, when viewed in the light most favorable to Strickland supports the contention that she subjectively perceived her workplace to be abusive.  Not only did Strickland maintain records of the harassing conduct of which she now complains but she complained to human resources regarding Schrage's conduct on numerous occasions and even complained directly to Schrage about his behavior.  Further, there is some evidence that Strickland sought outside counseling as a result of the treatment she received by Schrage.

There is no genuine dispute of material fact, however, as to whether Schrage's conduct was sufficiently severe or pervasive enough to create an objectively hostile work environment. The fundamental principle here is that the conduct alleged must be severe, pervasive, or as may sometimes occur, a combination of both so as to alter the conditions of the plaintiff's employment. *See Lapka v. Chertoff*, 517 F.3d 974 (7th Cir. 2008) ("[W]e have repeatedly stressed that the phrase "severe or pervasive" is disjunctive."); *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir.2000) ("Harassment need not be severe *and* pervasive to impose liability; one or the other will do."); *Tademy v. Union Pacific Corp*. 2008 WL 852491, 10 (10th Cir. 2008) ("Pervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim.").

Severe refers to the intensity and gravity of the allegedly harassing conduct;  sexual assaults or other similar intimate and forcible acts fall within this category even when they are isolated because they threaten the plaintiff's safety in her work environment thereby altering her conditions of employment. *See, e.g.*, *Lapka,* 517 F.3d at 970 ("It goes without saying that forcible rape is "unwelcome physical conduct of a sexual nature."); *Worth v. Tyer,* 276 F.3d 249, 268 (7th Cir.2001) (finding that direct contact with an intimate body part "constitutes one of the most severe forms of

sexual harassment."); *Hostetler,* 218 F.3d at 809 (finding conduct severe when fellow employee not only forcibly kissed plaintiff but later cornered plaintiff and attempted to remove her brassiere); *Smith v. Sheahan,* 189 F.3d 529, 532 (7th Cir.1999) (fellow employee physically assaulted plaintiff and had history of verbally abusing female co-workers).

Pervasive, on the other hand, denotes the frequency of the allegedly harassing conduct, that is, a workplace that is permeated with discriminatory conduct such as intimidation, ridicule, or insults on such a constant basis so as to make the workplace unbearable. See *Ryan v. Town of Schererville, Ind.*, 2005 WL 1172614, 11 (N.D.Ind.,2005) (denying summary judgment where plaintiff dealt daily with insults, and sexually derogatory name calling).

Reading the facts in the light most favorable to Strickland, she has alleged, in substance, two categories of harassment by Schrage running from 1996 until her termination in July, 2005.  The first category consists of  inappropriate, vulgar, and humiliating or embarrassing comments.  The second category is more troubling in that she alleges that Schrage physically touched her breast on one occasion, tried to kiss her at least once, and otherwise made repugnant gestures toward her.

Neither of the above categories, however, when viewed in isolation or in tandem, rise to the level of actionable sexual harassment.  The Supreme Court has held that "the objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).    Indeed, Schrage's conduct, while inappropriate, is similar to that in other cases finding no actionable sexual harassment. *Hilt-Dyson,* 282 F.3d at 463 (finding no hostile work environment where supervisor allegedly rubbed the plaintiff's back, squeezed her shoulder, stared at her chest, and told her to open her blazer during a

uniform inspection); *Baskerville v. Culligan Int'l,* 50 F.3d 428, 430 (7th Cir.1995) (finding no actionable harassment where the supervisor called the plaintiff a "pretty girl," made grunting sounds at the plaintiff, and stated that a public announcement to the plaintiff was a request that "all pretty girls run around naked"); *Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993) (finding no actionable harassment where supervisor asked plaintiff for dates on repeated occasions, twice attempted to kiss her, placed his hand on her shoulder several times, and placed "I love you" signs in her work area); *Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 328 (5th Cir.2004) (holding that comments to plaintiff about another employee's body, slapping plaintiff on the behind with a newspaper, grabbing or brushing up against plaintiff's breasts and behind, and attempting to kiss plaintiff were not severe as a matter of law); *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 871-75 (5th Cir.1999) (holding that several inappropriate comments, including "your elbows are the same color as your nipples," and touchings, including rubbing plaintiff's arm from shoulder to wrist, were not severe); but see, *Harvill v. Westward Communications, L.L.C.* 433 F.3d 428, 435-36 (5th Cir. 2005) (holding that unwanted touching of plaintiff's breasts and buttocks over a seven-month period, despite her protests on every occasion, qualified the behavior as sufficiently severe or pervasive).

And, while several of the incidents Strickland allege did involve potentially "severe" conduct, (such as the incident at the Centier Christmas party where Schrage attempted to kiss Strickland and unzip her jacket,) they lack the intensity of physical threats, forcible restraint or threats of adverse employment action that might place them in a more severe category.  Indeed, in *Hostetler*, the Seventh Circuit explained the "continuum of physical contact" as follows:

> There are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor. Cumulatively or in

conjunction with other harassment, such acts might become sufficiently pervasive to
support a hostile environment claim, but if few and far between they typically will not
be severe enough to be actionable in and of themselves. A hand on the shoulder, a
brief hug, or a peck on the cheek lie at this end of the spectrum. Even more intimate
or more crude physical acts-a hand on the thigh, a kiss on the lips, a pinch of the
buttocks-may be considered insufficiently abusive to be described as "severe" when
they occur in isolation. ...When the harassment moves beyond the sort of casual
contact which (if it were consensual) might be expected between friendly co-workers,
and manifests in more intimate, intrusive forms of contact, it becomes increasingly
difficult to write the conduct off as a pedestrian annoyance.

*Hostetler*, 218 F.3d at 808. See also *Patton v. Keystone RV Co.,* 455 F.3d 812, 816-817 (7th

Cir.2006) (distinguishing supervisor's touching of the plaintiff's leg and putting an arm around her

waist from placing his hand up her shorts and touching an "intimate body part").

In this case, an examination of the totality of the circumstances demonstrates that the most

severe instances of harassment alleged by Strickland  include physical touching that occurred once

or twice over approximately nine years of employment.  Moreover, the court must also consider the

social context in which the allegedly harassing conduct occurred.  See *Oncale*, 523 U.S. at 82

(indicating that assessment of objective component requires court to make an assessment with "an

appropriate sensitivity to social context,").  In this case,  the most offensive incidents happened in

the open in public places (at a tavern, for instance), at company parties where alcohol was present

and  in areas full of witnesses.  These encounters, thus lack the isolation and threatening nature that

often accompanies severe harassment. *Berry v. Chicago Transit Authority,* 2007 WL 1317139, 4

(N.D.Ill.,2007) (denying summary judgment where co-employee assaulted plaintiff in the break

room by grabbing plaintiff by her breasts, lifted her body and rubbed her against his lower torso

before pushing her into a fence); *Marchioni v. Board of Educ. of City of Chicago,* 341 F.Supp.2d

1036, 1045 (N.D.Ill.,2004) (finding that a reasonable jury could find severe conduct when supervisor

20

requested plaintiff to come to his office, demanded that she dance on his desk in exchange for better working conditions, invited her into his private bathroom with him, and physically restraining her while thrusting his pelvis against her); *Hollar v. RJ Coffey Cup, LLC,* 505 F.Supp.2d 439, 445 (N.D.Ohio,2007) (denying summary judgment where one incident alleged by plaintiff involved co-working luring plaintiff to a cooler in the back of a restaurant, forcibly grabbing her and trying to "stick his tongue down her throat"); *Noviello v. City of Boston*,398 F.3d 76, 97 (1st Cir. 2005) (finding "dubious" that an assault by co-worker who forcibly unhooked the plaintiff's brassière, ripped it from her body, hung it on the van's outside mirror, and bellowed a crude sexual remark to a fellow employee on the street was sufficient, in and of itself, to create a hostile work environment);

Moreover, the Seventh Circuit has repeatedly rejected hostile work environment claims based upon an overly amorous supervisor's occasional advances. For instance, the Seventh Circuit held that the conduct of a supervisor who took a plaintiff to a jazz club, placed his hand on her thigh, kissed her, and later asked her on a date and lurched at her from behind some bushes was not sufficiently severe or pervasive as to create an hostile work environment. *Saxton v. AT & T Co.,* 10 F.3d 526, 528-534 (7th Cir.1993). In another case, a supervisor who pulled back a plaintiff's shirt to examine her bra did not create a hostile work environment. *McPherson v. City of Waukegan,* 379 F.3d 430, 439 (7th Cir.2004).

Finally, Strickland's contentions that other women at Centier experienced sexual harassment by Schrage does not aid her cause since she has no personal knowledge of these incidents and case law deems them to have a lesser impact on her than firsthand acts directed at Strickland herself. See, e .g., *Kriescher v. Fox Hills GolfResort and Conference Ctr.*, 384 F.3d 912, 915 (7th Cir.2004) (plaintiff failed to demonstrate that her workplace was hostile when she was not personally exposed

to incidents she recounted); *McKenzie v. Milwaukee County,* 381 F.3d 619, 624-25 (7th Cir.2004) (holding that when determining whether the alleged acts create a hostile work environment, the Court must view secondhand information as having a lesser impact than direct, firsthand acts experienced by the plaintiff.)

Although it is unfortunate that Strickland had to endure the behavior she did from Schrage in her workplace, and that she did so over such a long span of time, it is evident from the record that this conduct rings truer to the side of coarse and boorish behavior than to actionable sexual harassment.  Indeed, in these types of cases, "the difficulty is drawing the line between merely some offensive activity and an objectively hostile environment." *McPherson*, 379 F.3d 430, 437-38 (7th Cir. 2004).  In *McPherson*, the Court cited much precedent for the proposition that actions, which, although vulgar or boorish, are spread out over time and are few and far between, are neither severe nor pervasive to the extent necessary to show that an objectively hostile work environment existed. *Id.* (citing *Hilt-Dyson,* 282 F.3d at 463-64; *Patt v. Family Health Sys., Inc.,* 280 F.3d 749, 754 (7th Cir.2002); *Adusumilli v. City of Chicago,* 164 F.3d 353, 361-62 (7th Cir.1998)).  That is what the evidence reveals occurred in this case and thus, Strickland's claim of a hostile work environment fails.  Accordingly, Centier's Motion for Summary Judgment as to this claim is, therefore, GRANTED.

## 2.   **Retaliation**

Aside from her claim of sexual harassment, Strickland also maintains that Centier, via Schrage, retaliated against her for opposing discrimination, that is, for opposing Schrage's inappropriate behavior towards her and other female employees of Centier.

Title VII's anti-retaliation provision prohibits employers from discriminating against employees for opposing discrimination on the basis of race, color, religion, sex, or national origin.

*See* 42 U.S.C.b § 2000e-3(a); *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 792 (7th Cir.2007).

A plaintiff alleging retaliation can prove her case either by the direct or indirect method of proof.

*Szymanski v. County of Cook,* 468 F.3d 1027, 1029 (7th Cir.2006). Under the direct method, direct

evidence of retaliation is not required. *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 686 (7th Cir.2008)

("This Court recently has clarified that ... 'circumstantial evidence that is relevant and probative on

any of the elements of a direct case of retaliation may be admitted and, if proven to the satisfaction

of the trier of fact, support a case of retaliation.' " (quoting *Treadwell v. Office of Ill. Sec'y of State,*

455 F.3d 778, 781 (7th Cir.2006))). Rather, a plaintiff must show through either direct or

circumstantial evidence that (1) she engaged in statutorily protected activity; (2) she suffered an

adverse action taken by the employer; and (3) there was a causal connection between the two.

*Dorsey v. Morgan Stanley,* 507 F.3d 624, 627 (7th Cir.2007). Under the indirect method, a plaintiff

must establish a prima facie case of retaliation by showing that (1) she engaged in statutorily

protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse

action; and (4) she was treated less favorably than similarly situated employees who did not engage

in statutorily protected activity. *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 785 (7th

Cir.2007). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the

employer to produce a non-discriminatory reason for its employment action. *Id.* If the employer

meets its burden of production, the burden of proof then remains with the plaintiff to show that the

employer's proffered reason is pretextual. *Id.*

Here, Centier's argument is two-fold. First, it contends that Strickland cannot establish a

prima facie case of retaliation because she did not engage in protected activity and she cannot

demonstrate that she was performing her job satisfactorily. Alternatively, Centier argues that

Strickland has no evidence to rebut the legitimate non-discriminatory reason given for altering Strickland's employment arrangement.

To establish that she had engaged in a protected activity, Strickland  was required to demonstrate that she complained about an act that she " 'reasonably believed in good faith ... violated Title VII.' " *Fine v. Ryan Int'l Airlines,* 305 F.3d 746, 752 (7th Cir.2002) (quoting *Alexander v. Gerhardt Enters., Inc.,* 40 F.3d 187, 195 (7th Cir.1994)); *see Dey v. Colt. Constr. & Dev. Co.,* 28 F.3d 1446, 1457-58 (7th Cir.1994). Only a groundless claim "resting on facts that no reasonable person possibly could have construed as a case of discrimination" could not constitute a statutorily protected activity. *Fine,* 305 F.3d at 752. And a mistake as to the merits of a complaint does not cost an employee the protection of Title VII. *Mattson v. Caterpillar, Inc.,* 359 F.3d 885, 892 (7th Cir.2004).

Strickland asserts that her complaint to Schrage that his relationship with Kirincic was causing friction in the Marketing Department is sufficient to establish that she engaged in statutorily protected activity.  Strickland contends that what she "opposed" through her discussion with Schrage was what she had been opposing throughout her employment with Centier, namely, Schrage's suggestive and harassing behavior of female employees.

In light of the circumstances of this case, Strickland's complaint to Schrage cannot be viewed in isolation.  Reading the facts favorably to Strickland, this court has little trouble concluding that Strickland could have reasonably viewed her discussion with Schrage to be protected activity.  When viewed in the context of her previous complaints to both human resources personnel and to Schrage directly that his behavior was offensive, it is reasonable for a jury to conclude that Strickland believed she was opposing an unlawful employment practice at the time she asked Schrage to

discontinue his workplace pursuits of Kirincic.

As for whether Strickland was performing satisfactorily, this requires careful analysis since it is closely intertwine with the legitimate non-discriminatory reason offered by Centier for her termination and the issue of pretext. *See Hague v. Thompson Distrib. Co.,* 436 F.3d 816, 823 (7th Cir.2006); *see Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir.1997). Accordingly, the Court will consider the issues together with the Plaintiff's claim that the Defendant's reasons for firing him were pretextual. *See Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 600 (7th Cir.2001) (where *prima facie* analysis would overlap substantially with the question of pretext, the court may address the two together).

Centier argues that Strickland's performance was lacking; that "turnover in the marketing department was very high and in a large measure, this related to Plaintiff's ability – or inability – to deal with others and to her emotional and volatile personality." (Dfdt's Answer to Interrog. 2). Yet, there is ample evidence in the record to demonstrate that through her January 2005 review, Strickland was exceeding her employer's expectations, even if on the low end of that scale. Centier points to no instances of Strickland's performance at any time during her employment, let alone at or around the time of the adverse employment action, that triggered disciplinary action or probationary periods. Nor was Strickland ever counseled, in her performance reviews or otherwise, that if various areas of her performance did not improve, she would face termination or similar consequences. In fact, her overall rating on her January 2005 performance evaluation was "exceeds plus" which calls into question the explanation by Centier that her performance was lacking.

Strickland's evidence further suggests that after she complained to Schrage about the effect of his personal relationship with Kirincic, she was treated more harshly by Schrage. The evidence

25

read favorably to Strickland is that Schrage "all of a sudden" decided that Strickland should take a sabbatical or work a reduced schedule which he contends was based upon her prior six months performance. However, there is no detailed exposition anywhere in the record as to what problems triggered his decision that Strickland should reduce her schedule. Moreover, Centier's argument that it was her performance in the previous six months that prompted Schrage's decision is questionable since Strickland was on medical leave during three of the preceding six months and, until then her performance had, with only a few comments, been well within the legitimate expectations of her employer. On the whole, this evidence calls into question the legitimacy of the proffered reason for the employer's actions. *See Gordon* v. *United Airlines, Inc.,* 246 F.3d 878, 888 (7th Cir.2001) (to establish pretext, plaintiff must demonstrate that employer's proffered reason was unworthy of belief).

Although the court does not stand as a superpersonnel department and the proffered reason must only be sincere, "a determination of whether a belief is honest is often conflated with analysis of reasonableness." *Id.* at 889 (internal quotations omitted). Here, the evidence gives rise to genuine issues of material fact as to whether Centier legitimately (and reasonably) believed its reason for requesting Strickland to take a sabbatical and/or reduced work schedule or whether the "reason" was fabricated after Strickland called Schrage on the carpet for causing friction in the Marketing Department due to his alleged affair with Kirincic. The circumstances surrounding the two events requires a trial to resolve. Accordingly, Centier's Motion for Summary Judgment on Strickland's retaliation claim is DENIED.

**B.**     **Title VII Claims Against Michael Schrage, Individually**

Strickland's claims alleging hostile work environment sexual harassment and retaliation

against Schrage in his individual capacity are easily dispensable.  In *Williams v. Banning,* 72 F.3d 552, 553 (7th Cir.1995), the Seventh Circuit  squarely held that Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq. ,* does not impose individual liability on supervisory employees of an employer.   Indeed, it is well settled that "[a]n individual who does not independently meet Title VII's definition of an 'employer,' cannot be held liable under Title VII." *EEOC v. Oak Lawn Ltd., III,* 987 F.Supp. 647, 649 (N.D.Ill.1997) (citing *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1279-82 (7th Cir.1995). Thus, an individual who does not employ employees, but is only a supervisor, cannot be personally liable for acts of discrimination. *See, e.g., Geier v. Medtronic, Inc.,* 99 F.3d 238, 244 (7th Cir.1996) (holding there is no individual liability for a supervisor under Title VII); *Williams,* 72 F.3d at 552 (holding "[b]ecause Title VII does not impose 'employer' liability on a supervisor in his individual capacity for acts which violate the statute," dismissal was warranted).

Strickland has put forth no evidence or any argument whatsoever that Schrage is an "employer" under Title VII, and the Court is not aware of any such evidence in the record. Consequently, the Court concludes that summary judgment is appropriate on Plaintiff's Title VII claims against Schrage as he is not subject to individual liability.

**C.   State Law Claims**

Strickland's Complaint also alleges state law claims of retaliatory discharge, intentional infliction of emotional distress, and invasion of privacy against both Schrage and Centier. Strickland concedes in her brief, however, that the evidence does not support these claims. Accordingly, the Defendants' Motion for Summary Judgment on these claims is GRANTED.

## <u>CONCLUSION</u>

Based on the foregoing, Schrage's Motion for Summary Judgment is GRANTED in its entirety. Centier's Motion for Summary Judgment is GRANTED as to Strickland's claims of hostile work environment sexual harassment and her state law claims. Centier's Motion for Summary Judgment is DENIED as to Strickland's Title VII claim of retaliation.

Entered: This 15th day of April, 2008

s/ William C. Lee<br>
United States District Court